# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CALVIN SMITH and ANGEL OBANDO, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-01937-JZ |
| Plaintiffs, | Judge Jack Zouhary |
| v. | |
| ANTONIO SOFO & SON IMPORTING CO., | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| Defendant. | JURY TRIAL DEMANDED |

Plaintiffs Calvin Smith and Angel Obando ("Plaintiffs"), on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Antonio Sofo & Son Importing Co. ("Defendant"). Plaintiffs allege the following upon information and belief based on and the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1.      Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII"[1] or "Private Information") and that was impacted in a cyber incident (the "Data Breach" or the "Breach").

2.      Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

transfer that information.

3.     Defendant is an Italian food distributor that distributes its products across the United States.

4.     On July 29, 2025, Defendant detected unauthorized activity on its network.[2] In response, Defendant launched an investigation to determine the nature and scope of the Data Breach.[3]

5.     On August 12, 2025, Defendant learned that Private Information contained on its network was accessed by the unauthorized third-party.[4]

6.     Upon information and belief, the following types of Private Information were exposed as a result of the Data Breach: names and Social Security numbers.[5]

7.     On August 27, 2025—a month after Defendant was made aware of the Data Breach—Defendant issued a public disclosure about the Data Breach and began sending notice letters ("Notice" or "Notice Letter") to impacted individuals.

8.     Defendant failed to take precautions designed to keep individuals' Private Information secure.

9.     Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

10.     Defendant admits that information in its system was accessed by unauthorized

---

[2] Exhibit A, Plaintiff Smith's Notice Letter.

[3] *Id.*

[4] *Id.*

[5] *Id.*

individuals, though it provided little information regarding how the Data Breach occurred.

11.     The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their private information and are subject to an increased risk of identity theft.

12.     Defendant, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practice appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiffs and Class Members, causing the exposure of Plaintiffs' and Class Members' Private Information.

13.     As a result of Defendant's inadequate digital security and notice process, Plaintiffs' and Class Members' Private Information was exposed to criminals. Plaintiffs and the Class Members have suffered and will continue to suffer injuries including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal and financial information.

14.     Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiffs and Class Members of the Data Breach. Defendant's conduct amounts to at least negligence and violates federal and state statutes.

15.     Plaintiffs bring this action individually and on behalf of a Class of similarly

situated individuals against Defendant for: negligence; negligence *per se*; unjust enrichment; and breach of implied contract.

16.     Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

17.     Plaintiff Calvin Smith is a citizen and resident of Snellville, Georgia.

18.     Plaintiff Angel Obando is a citizen and resident of Norcross, Georgia.

19.     Defendant is an Ohio corporation with its principal place of business located at 253 Waggoner Blvd, Toledo, Ohio 43612.

## JURISDICTION AND VENUE

20.      The Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Class Member is diverse from Defendant, including Plaintiffs, and there are over 100 putative Class Members.

21.     The Court has general personal jurisdiction over Defendant because Defendant is incorporated in the State of Ohio and maintains its headquarters and principal place of business in the State of Ohio.

22.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## **FACTUAL ALLEGATIONS**

### A. **Background on Defendant**

23.     Defendant is one of the largest family-owned food distributors in the country.

24.     Upon information and belief, Defendant made promises and representations to individuals, including Plaintiffs and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

25.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

26.     As a result of collecting and storing the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties.

### B. **The Data Breach**

27.     On July 29, 2025, Defendant learned that an unauthorized third-party accessed its network.[6] In response, Defendant launched an internal investigation to determine the nature and scope of the Data Breach.[7]

28.     On August 12, 2025, Defendant learned that Private Information contained in its network was accessed by the unauthorized third-party.[8]

---

[6] Ex. A.

[7] *Id.*

[8] *Id.*

29.     Upon information and belief, the following types of Private Information were exposed as a result of the Data Breach: names and Social Security numbers.[9]

30.     On August 27, 2025, Defendant issued a public disclosure about the Data Breach and began sending Notice to impacted individuals.

31.     Defendant failed to take precautions designed to keep individuals' Private Information secure.

32.     While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiffs and Class Members.

33.     Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C.  Defendant's Failure to Prevent and Identify the Data Breach**

34.     Defendant admits that an unauthorized third party accessed its network. Defendant failed to take adequate measures to protect its computer systems against unauthorized access.

35.     The Private Information that Defendant allowed to be exposed in the Data Breach is the type of private information that Defendant knew or should have known would be the target of cyberattacks.

36.     Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[10] Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard Plaintiffs' and Class Members' Private Information.

---

[9] *Id.*

[10] FTC, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Dec. 19, 2025).

37.     The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[11]

### D.  Defendant Knew—or Should Have Known—of the Risk of a Data Breach

38.     It is well known that Private Information is an invaluable commodity and a frequent target of hackers.

39.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable business, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

40.     In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[12]

41.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.[13]

42.     Therefore, the increase in such attacks, and attendant risk of future attacks, was

---

[11] *Id.*

[12] Identity Theft Resource Center, *ITRC 2024 Data Breach Annual Report* (Feb. 4, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Dec. 19, 2025).

[13] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Dec. 19, 2025).

widely known to the public and Defendant.

43.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

44.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

45.     In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

**E. Plaintiffs' Experiences and Injuries**

*Plaintiff Smith's Experience*

46.     At all times relevant Plaintiff Smith was an employee of Defendant and a data breach victim.

47.     Plaintiff Smith was required to provide his Private Information to Defendant as a condition of receiving employment.

48.     Plaintiff Smith provided his Private Information to Defendant with the

understanding that the company would adequately protect it using reasonable security measures. Had Plaintiff Smith been aware that Defendant's computer systems were not secure, he would not have entrusted his personal data to Defendant.

49.     On August 27, 2025, Defendant sent Plaintiff Smith a Notice informing him that his Private Information was compromised in the Data Breach.[14]

50.     As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Smith's Private Information for theft by cybercriminals and given the purpose of the hack, for sale on the Dark Web.

51.     Defendant deprived Plaintiff Smith of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

52.     Plaintiff Smith suffered actual injury from the exposure of his Private Information —which violates his rights to privacy.

53.     Plaintiff Smith suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

54.     As a result of the Data Breach, Plaintiff Smith has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements and monitoring his credit information.

55.     Plaintiff Smith will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what Private Information was exposed. Plaintiff has been and is experiencing feelings of anxiety, stress, fear, and frustration because of the loss of privacy and risk of harm he

---

[14] Ex. A.

9

now faces. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

56.     And in the aftermath of the Data Breach, Plaintiff Smith has received spam emails and text messages attempting to solicit payments from him.

57.     Plaintiff Smith received an email notification that his Private Information was published on the Dark Web after the Data Breach.

58.     Since the Data Breach, Plaintiff Smith has received notifications about unauthorized individuals attempting to make purchases on his behalf.

59.     Plaintiff Smith is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff about the Data Breach.

60.     Once an individual's Private Information is for sale and access on the Dark Web, cybercriminals are able to use the stolen and compromised information to gather and steal even more information.[15] Plaintiff's Private Information was compromised as a result of the Data Breach.

61.     Plaintiff Smith has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

62.     Plaintiff Smith also has a continuing interest in lifetime credit monitoring and identity theft monitoring on account of the Data Breach.

---

[15] Ryan Toohill, *What do Hackers do with Stolen Information,* Aura (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited Dec. 19, 2025).

### *Plaintiff Obando's Experience*

63.     At all times relevant, Plaintiff Obando was an employee of Defendant.

64.     Plaintiff Obando provided Defendant with his sensitive PII as a condition of receiving employment with Defendant. Plaintiff received notice of the Data Breach around August 27, 2025 informing him that his sensitive information was part of Defendant's Data Breach.

65.     Had Plaintiff Obando been aware that Defendant's computer systems were not secure, he would not have entrusted his personal data to Defendant.

66.     Because of the Data Breach, Defendant advised Plaintiff Obando to take certain steps to protect his Private Information and otherwise mitigate his damages.

67.     Because of the Data Breach, Plaintiff Obando spent time dealing with the consequences of the Data Breach, including time spent verifying the legitimacy of the Notice Letter and self-monitoring his accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate his damages by, among other things, monitoring his accounts for fraudulent activity. Plaintiff Obando will need to spend time (and likely money) on an ongoing basis to mitigate the substantial risk of imminent harm that he will continue to face.

68.     Plaintiff Obando suffered an invasion of privacy from the exfiltration of his PII. He has also suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information-a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy and the risk of harm he now faces.

69.     Plaintiff Obando has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

70.     Plaintiff Obando has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

71.     Plaintiff Obando also has a continuing interest in lifetime credit monitoring and identity theft monitoring on account of the Data Breach.

### F.  Plaintiffs and Class Members Suffered Common Injuries and Damages Due to Defendant's Conduct

72.     Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

73.     Defendant disregarded the rights of Plaintiffs and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (b) failing to disclose that it did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

74.     Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, inter alia, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an

12

increased risk of suffering:

      a.   identity theft and fraud;

      b.   loss of time to mitigate the risk of identity theft and fraud

      c.   diminution in value of their Private Information;

      d.   out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

      e.   lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identity theft and fraud;

      f.   delay in receipt of tax refund monies;

      g.   loss of the opportunity to control how their Private Information is used;

      h.   compromise and continuing publication of their Private Information;

      i.   unauthorized use of their stolen Private Information;

      j.   invasion of privacy; and

      k.   continued risk to their Private Information —which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

75.    To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

76.    The 12 months of credit monitoring offered to persons whose Private Information

was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendant places the burden on Plaintiffs and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

77.     Defendant's credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

78.     Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

79.     Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

80.     Plaintiffs and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

81.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

82.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

83.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

84.     Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

85.     Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

86.     Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

87.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

88.     Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

89.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety.

90.     The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendant's wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing

credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

### G.  Substantial Increased Risk of Continued Identity Theft

91.     Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

92.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

93.     The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

94.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

95.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[16] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance.

96.     For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad. onion.[17] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

97.     For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[18] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[19]

98.     The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

99.     The value of Plaintiffs' and Class's Private Information on the black market is

---

[16] Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Dec. 19, 2025).

[17] *Id.*

[18] Armor Team, *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Dec. 19, 2025).

[19] *Id.*

considerable. Stolen Private Information trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained. Criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

100.    PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

101.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

102.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

103.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

---

[20] *Id.*

[21] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Dec. 19, 2025).

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

104.    Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; rent a house or receive medical services in the victim's name; use the victim's Private Information to obtain government benefits; and may even give the victim's personal information to police during an arrest resulting in criminal proceedings commenced under the victim's name. In addition, identity thieves may obtain a job using the victim's information, and file a fraudulent tax return using the victim's information.[22]

105.    One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[23] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private

---

[22] Social Security Administration, *Identity Theft and Your Social Security Number,* 4 (Oct. 2024), https://www.ssa. gov/pubs/EN-05-10064.pdf (last visited Dec. 19, 2025).

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/ 2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Dec. 19, 2025).

Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

106.    The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

107.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[24]

108.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[25] Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take necessary steps to mitigate the harm caused by the Data Breach.

---

[24] FBI, *2019 Internet Crime Report Released*, FBI.gov (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Dec. 19, 2025).

[25] *Id.*

109.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

110.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

111.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

**H.  Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

112.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

113.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

114.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

115.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

116.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

117.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### I.    Diminished Value of Private Information

118.    Personal data like Private Information is a valuable property right.[27]

---

[26] See FTC, *What To Do Right Away: What To Do Next*, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Dec. 19, 2025).

[27] See, e.g., John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

119. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

120. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28]

121. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[30]

122. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

123. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

**J. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.**

124. To date, Defendant has done little to provide Plaintiffs and Class Members with

---

[28] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, L.A. Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 19, 2025).

[29] Datacoup, Inc., *The personal data revolution*, https://datacoup.com (last visited Dec. 19, 2025).

[30] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Dec. 19, 2025).

relief for the damages they have suffered due to the Data Breach.

125.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

126.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

127.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.

128.     The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

129.     Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

130.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for many years (if not a lifetime) that Plaintiffs and Class Members will bear because of Defendant's

failure to safeguard their Private Information.

### K.  Lost Benefit of the Bargain

131.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

132.    When agreeing to provide their Private Information, which was a condition precedent to receive employment from Defendant, Plaintiffs and Class Members, understood and expected that they were, in part, paying for services or receiving lesser wages, in exchange for data security to protect the Private Information they were required to provide.

133.    Plaintiffs value data security. Indeed, data security is an important consideration for seeking employment.

134.    In 2024, the technology and communications conglomerate Cisco published the results of its annual *Consumer Privacy Survey*[31] and *Data Privacy Benchmark Study*.[32] Therein, Cisco reported the following:

> For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data.[33]

135.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[34] 89% of consumers stated that "I care about data privacy."[35] 83% of consumers

---

[31] Cisco, *Privacy Awareness: Consumers Taking Charge to Protect Personal,* https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Dec. 19, 2025).

[32] Cisco, *Privacy as an Enabler of Consumer Trust*, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Dec. 19, 2025).

[33] *Privacy Awaremess*, 3, *supra*, n.31.

[34] *Privacy as an Enabler of Consumer Trust*, 3, *supra*, n.32.

[35] *Privacy Awaremess*, 9, *supra*, n.31.

declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[36]

136.    Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

**L.  Defendant Could Have Prevented the Data Breach.**

137.    Data breaches are preventable.[37] As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[38] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[39]

138.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [40]

139.    In a Data Breach like the one here, many failures laid the groundwork for the Breach. For example, the FTC has published guidelines that establish reasonable data security

---

[36] *Id.*

[37] Lucy L. Thomson, *Despite the Alarming Trends, Cybersecurity Incidents Are Preventable*, in *Cybersecurity Incident and Encryption Handbook* (Lucy Thompson, ed., 2012).

[38] *Id.* at 17.

[39] *Id.* at 28.

[40] *Id.*

practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

140. Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

**M. Defendant Failed to Adhere to FTC Guidelines.**

141. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Private Information.

142. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should: (i) protect the personal information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

143. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

144. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

145.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect individuals data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

146.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**N.  Defendant Failed to Follow Industry Standards.**

147.    Experts studying cybersecurity routinely identify financial corporations as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

148.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

149.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

150. Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted any data it no longer needed to provide services to Plaintiffs and the Class.

151. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

152. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ALLEGATIONS

153. Plaintiffs bring this class action, individually and on behalf of the following Class:

All living persons residing in the United States who were impacted by the Data Breach publicly announced by Defendant in August 2025 and received a Notice from Defendant (the "Class").

154. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

155. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

156. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

157. <u>Numerosity</u>: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class is comprised of thousands of members. The Class is sufficiently numerous to warrant certification.

158. <u>Typicality of Claims</u>: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harms suffered by Plaintiffs are similar to that suffered by all other Class Members which was caused by the same misconduct by Defendant.

159. <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

160. <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for

its wrongdoing as asserted herein.

161.    Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c.    Whether Defendant's storage of Plaintiffs' and Class Member's Private Information was done in a negligent manner;

d.    Whether Defendant had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;

e.    Whether Defendant's conduct was negligent;

f.    Whether Defendant's conduct violated Plaintiffs' and Class Members' privacy;

g.    Whether Defendant's conduct violated the statutes as set forth herein;

h.    Whether Defendant took sufficient steps to secure Plaintiffs and Class Members Private Information;

i.    Whether Defendant was unjustly enriched; and

j.    The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

162.    Information concerning Defendant's policies is available from Defendant's records.

163.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

164.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

165.    Given that Defendant had not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

166.    Plaintiffs incorporate by reference and re-allege paragraphs 1 through 165 above as though fully set forth herein.

167.    Plaintiffs bring this claim individually and on behalf of the Class Members.

168.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information for its own benefit.

169.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

170.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

171.    Defendant had a duty to adequately train and supervise employees and agents with access to Plaintiffs' and Class Members' Private Information.

172.    Defendant had, and continues to have, a duty to timely disclose that Plaintiffs' and

Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

173.    Defendant's duties of care arose because of the special relationship that existed between Defendant and its employees. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

174.    Defendant's duties of care also arose because Defendant created the dangerous conditions that led to the Data Breach by actively obtaining and storing Plaintiffs' and Class Members' Private Information in a way that was vulnerable to foreseeable threats.

175.    Defendant breached its duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information.

176.    The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

    b.  Storing Plaintiff's Private Information in a way that Defendant knew or should have known was vulnerable to foreseeable threats;

    c.  Failing to adequately monitor the security of its networks and systems;

    d.  Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards;

    e.  Failing to detect, report, and eliminate foreseeable threats;

    f.  Failing to adequately train its employees to detect, report, and prevent security threats;

g. Failing to adequately supervise employees with access to Private Information; and

h. Failing to timely notify victims that their Private Information was compromised in a data breach or to adequately explain what occurred.

177. Defendant's negligence and/or recklessness caused Plaintiffs' and Class Members' Private Information to be compromised.

178. It was foreseeable that Defendant's breach of duties would result in injuries to Plaintiffs and Class Members.

179. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

180. As a result of Defendant's failure to timely and adequately notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

181. As a result of Defendant's negligence and/or recklessness, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer the injuries described herein, including but not limited to a substantial increase in the likelihood of identity theft; loss of privacy; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent,

detect, and repair the impact of the personal information compromised as a result of the Data Breach.

182.    Plaintiffs are entitled to the damages, declarative judgment, and injunctive relief requested in the Prayer for Relief.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

183.    Plaintiffs incorporate by reference and re-allege paragraphs 1 through 165 above as though fully set forth herein.

184.    Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

185.    Defendant violated Section 5 of the FTC Act (and similar state statutes, like the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq.*) by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with industry standards.

186.    Defendant breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement proper data security procedures to adequately and reasonably protect Plaintiffs' and Class Members' Private Information. In violation of the FTC guidelines, *inter alia,* Defendant did not protect the Private Information it keeps; failed to properly dispose

of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

187. Defendant's conduct was particularly unfair, deceptive, and unconscionable because of the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

188. Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

189. Moreover, the harm that has occurred is the type of harm the FTC Act and similar state statutes were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures, caused the same harm suffered by Plaintiff and Class Members. There are also numerous judgments within the Ohio Public Inspection File for CSPA violations related to data security.[41]

190. As a result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered the injuries described above.

191. Plaintiffs are entitled to the damages, declarative judgment, and injunctive relief requested in the Prayer for Relief.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

192. Plaintiffs incorporate by reference and re-allege paragraphs 1 through 165 above

---

[41] *See* Ohio Attorney General Online Public Inspection File, https://opif.ohioattorneygeneral.gov/ Search/Pifs (filter by the "Data Breach" category) (last visited Dec. 19, 2025).

as though fully set forth herein.

193.    This claim is pled in the alternative to the implied contract claim.

194.    Plaintiffs and Class Members conferred a benefit upon Defendant by providing Defendant with their Private Information.

195.    Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs. Defendant also benefited from the receipt of Plaintiffs' and Class Members' Private Information.

196.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the Class Members' Private Information or their labor because Defendant failed to adequately protect their Private Information. Plaintiffs and the proposed Class would not have provided their Private Information or labor to Defendant had they known Defendant would not adequately protect their Private Information.

197.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach it caused.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

198.    Plaintiffs incorporate by reference and re-allege paragraphs 1 through 165 above as though fully set forth herein.

199.    This claim for breach of contract is brought in the alternative to claims arising in tort or equity.

200.    Plaintiffs and the Class provided and entrusted their Private Information to Defendant. Plaintiffs and the Class provided their Private Information to Defendant as part of

Defendant's regular business practices and as a condition of receiving employment.

201.    Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendant with their Private Information and labor. In exchange, Defendant agreed not only to provide (or consider an applicant for) employment and wages, but also to (1) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Private Information; (2) protect Plaintiffs' and Class Members' Private Information in compliance with federal and state laws and regulations, industry standards, and/or its own policies; (3) that both Defendant and its employees would maintain the confidentiality and security of each other's sensitive information; and (4) that Defendant would timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised.

202.    Defendant breached its implied contracts with Plaintiffs and Class Members by:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

   b.  Storing Plaintiff's Private Information in a way that Defendant knew or should have known was vulnerable to foreseeable threats;

   c.  Failing to adequately monitor the security of its networks and systems;

   d.  Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards;

   e.  Failing to detect, report, and eliminate foreseeable threats;

   f.  Failing to adequately train its employees to detect, report, and prevent security threats;

   g.  Failing to adequately supervise employees with access to Private Information; and

h.  Failing to timely notify Plaintiffs and Class Members that their Private Information was compromised in a data breach or to adequately explain what occurred.

203.    Defendant's conduct also violated the duty of good faith and fair dealing.

204.    Plaintiffs and Class Members would not have provided Defendant with their labor or entrusted it with their Private Information (at the very least, not for the same wages they were paid) had they known that their Private Information would not be adequately protected, or that Defendant would not be transparent with them in the aftermath of a data breach.

205.    These exchanges constituted an agreement and meeting of the minds between the parties. When Plaintiffs provided Defendant with their Private Information, mutual assent (and a resulting contractual obligation) was formed.

206.    As a proximate and direct result of Defendant's breaches of its implied contracts with Plaintiffs and Class Members, Plaintiff and the Class Members suffered a lost benefit of their implied bargain for data security, in addition to the injuries described above.

207.    Plaintiffs are entitled to the damages, declarative judgment, and injunctive relief requested in the Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant on all counts asserted herein, as follows:

(a)    For an order determining that this action is properly brought as a class action, certifying a plaintiff class as defined herein, and appointing Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)    Declaring that Defendant's conduct violates the laws referenced herein;

(c)     Granting injunctive relief requiring Defendant to: (1) implement and maintain reasonable data security; (2) provide Plaintiffs and Class Members with lifetime credit monitoring and identity theft insurance services; and (3) send a curative notice explaining in more detail what occurred during the Data Breach, how it occurred, the risk the recipient faces, and the steps that should be taken to mitigate that risk.

(d)     Awarding nominal or compensatory damages in amounts to be determined by the Court and/or jury;

(e)     Awarding statutory damages or penalties to the extent available;

(f)     Awarding pre- and post-judgment interest on all amounts awarded;

(g)     Ordering restitution, disgorgement, and all other forms of monetary relief; and

(h)     Ordering such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: December 19, 2025

Respectfully submitted,

/s/ *Terence R. Coates*
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
1 W Las Olas Blvd, Suite 500

Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Josh Sanford
**SANFORD LAW FIRM, PLLC**
Kirkpatrick Plaza
10800 Financial Centre Pkwy, Suite 510
Little Rock, Arkansas 72211
Telephone: (800) 615-4946
Facsimile : (888) 787-2040
service@eksm.com

Christopher E. Torres*
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Telephone : (888) 350-3931
Facsimile : (888) 276-3455
service@eksm.com

*Attorneys for Plaintiffs and the Proposed Class*

*Motion to appear *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I served the foregoing upon all parties through their counsel of record by filing it with the Court's electronic-filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E).

/s/ *Terence R. Coates*
Terence R. Coates (0085579)